## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**DIANNA KOMETH, SALLY LABREE, HARRY PETERSON**, and **PATRICK BURNHAM** on behalf of themselves and all others similarly situated,

      Plaintiffs,

  v.

**MORLEY COMPANIES, INC.,**

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.  22-10311**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

---

## CLASS ACTION COMPLAINT

Plaintiffs Dianna Kometh, Sally Labree, Harry Peterson and Patrick Burnham (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendant Morley Companies, Inc. ("Morley" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below, from the Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### I.     NATURE OF THE ACTION

1.     This class action arises out of the recent cyberattack and data breach ("Data Breach") that was perpetrated against Defendant Morley, an international

provider of business    services to Fortune 500 companies, which held in its possession certain personally identifiable information ("PII") of the Plaintiffs and the putative Class Members (defined below), who are (or were) employees of Defendant and various clients. As a result of the Data Breach, Plaintiffs and thousands of Class Members, suffered concrete injury in fact, including actual credit card fraud sustained by one Plaintiff.  Plaintiffs and Class Members also suffered ascertainable losses in the form of the loss of the benefit of their bargain, lost value of their PII, out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

2.     In addition, Plaintiffs' and Class Members' sensitive PII—which was entrusted to Defendant—was compromised and unlawfully accessed due to the Data Breach.

3.     The private information compromised in the Data Breach included names, addresses, Social Security numbers (the holy grail for identity thieves), dates of birth, driver's license numbers, client and/or member identification numbers, medical diagnostic and treatment information, and health insurance information including medication, condition or provider (collectively, the "PII" or "Private Information").

4.     The Private Information compromised in the Data Breach was exfiltrated by the cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

5.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' Private Information.

6.     Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

7.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

8.     Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

9.     In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its property, it would have discovered the intrusion sooner.

10.    Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

11.    Armed with the Private Information accessed in the Data Breach, data thieves have already engaged in identity theft and fraud, and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members'

information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.    As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.    Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.    Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15.    Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

16.    Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct.

## II.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

18.    This Court has personal jurisdiction over Defendant because the conduct at issue in this case occurred, among other locations, in Michigan, where Defendant is headquartered.

19.    Venue is proper because a substantial portion of the events complained of occurred in this District.

### III.   PARTIES

20.    Plaintiff Dianna Kometh is a resident and citizen of Mesa, Arizona. Plaintiff Kometh is acting on her own behalf and on behalf of others similarly situated. Defendant obtained and continues to maintain Plaintiff Kometh's PII and has a legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Kometh would not have entrusted his PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff Kometh's PII was compromised and disclosed as a result of the Data Breach.

21.    Plaintiff Sally Labree is a resident and citizen of Manchester, Tennessee. Plaintiff LaBree is acting on her own behalf and on behalf of others

similarly situated. Defendant obtained and continues to maintain Plaintiff LaBree's PII and has a legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff LaBree would not have entrusted her PII to Defendant had she known that it would fail to maintain adequate data security. Plaintiff LaBree's PII was compromised and disclosed as a result of the Data Breach.

22.     Plaintiff Harry Peterson is a resident and citizen of Harrison, Michigan. Plaintiff Peterson is acting on his own behalf and on behalf of others similarly situated. Defendant obtained and continues to maintain Plaintiff Peterson's PII and has a legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Peterson would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security. Plaintiff Peterson's PII was compromised and disclosed as a result of the Data Breach.

23.     Plaintiff Patrick Burnham is a resident and citizen of Scotts, Michigan. Plaintiff Burnham is acting on his own behalf and on behalf of others similarly situated. Defendant obtained and continues to maintain Plaintiff Burnham's PII and has a legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Burnham would not have entrusted his PII to Defendant had he known that it would fail to maintain adequate data security. Plaintiff Burnham's PII was compromised and disclosed as a result of the Data Breach.

24.     Defendant Morley is a Michigan corporation with its principal place of business at 1 Morley Plaza, Saginaw, Michigan 48603.  Morley employs over 2,500 associates nationwide and provides to dozens of Fortune 500 companies business services, including processing information for health plans.

## IV.   STATEMENT OF FACTS

### A.   Nature of Defendant's Business

25.     Defendant provides business services to other business, including business process outsourcing, meeting planning, and the production of exhibits and displays. Defendant provides customer service to companies in a variety of industries including automotive, chemical, financial, insurance, healthcare, technology, and communications.[1]

26.     On information and belief, in the course of collecting Private Information directly or indirectly from Plaintiffs and Class Members, Morley promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

---

[1] *See* https://www.morleynet.com/About/ (last visited Feb. 11, 2022).

8

27.     Morley made these promises in, among other things, its Notices of Privacy Practices[2] and in its marketing materials.   For example, on its website, Morley claims:

> We understand the critical nature of our clients' data and employ a comprehensive access and security policy to safeguard against unauthorized access. Password-protected door locking mechanisms and strict adherence to data authorization protocols are among the many steps that help secure these important client assets.[3]

28.     Plaintiffs and Class Members provided Morley (directly or indirectly through their employers or insurance companies) with at least the following Private Information:

    a.     names;

    b.     addresses;

    c.     dates of birth;

    d.     Social Security numbers;

    e.     Client and/or member identification numbers;

    f.     medical diagnostic and treatment information; and

    g.     health insurance information, including medication, condition or provider.

---

[2] *See, e.g.*, https://www.morleynet.com/About/Privacy-Policy/ (last visited Feb. 11, 2022).

[3]     https://www.morleynet.com/Services/Business-Process-Outsourcing/Products/Back-Office-Processing/ (last visited Feb. 11, 2022).

29.     Morley had a duty to adopt reasonable measures to protect Plaintiffs'
and Class Members' PII from involuntary disclosure to third parties.

**B.     The Data Breach**

30.     In a Notice of Data Security Incident letter dated February 1, 2022 that
Defendant Morley sent to Plaintiffs and Class Members, it asserts that it first
discovered the Data Breach on August 1, 2021, "when it could not access certain
files and folders on its systems."[4]

31.     Morley contends that it retained a third-party computer forensic
specialist "to determine the nature and scope of the incident along with helping
restore our systems."[5]

32.     Morley claims that its investigation revealed that "a ransomware-type
malware had prevented access to some data files on our system beginning August 1,
2021 and there was unauthorized access to some files that contained personal
information."[6]

33.     Morley also claims that on January 18, 2022, it "confirmed" that
Plaintiffs' and Class Members' Personal Information was involved in an "incident."[7]

---

[4] *See, e.g.,* https://www.mass.gov/doc/assigned-data-beach-number-25888-morley-companies-inc-additional-information/download (last visited Feb. 11, 2022).
[5] *Id.*
[6] *Id.*
[7] *Id.*

34.    The Data Breach prompted Michigan Attorney General Dana Nessel to issue consumer protection reminders in a press release on February 11, 2022.[8]  The press release, after providing information about the Data Breach, warned:

> While the notification letters going to potentially affected individuals are legitimate, bad actors may take the opportunity to use the breach to access additional personal information.
>
> "Watch out for fraudulent emails, phone calls, and text messages seeking personal or banking information in connection to the Morley breach," Nessel said. "As recipients of the notice will see in Morley's letter, the company will explain steps to take to protect the information, as well as access to free credit monitoring and identity theft protection services.  If you receive other correspondence that asks you do to something like call a number to confirm your personal information, assume it's a scam."[9]

35.    Ransomware is a type of malware that prevents or limits users from accessing their system, either by locking the system's screen or by locking the users' files until a ransom is paid. While at one time the prime motive of a ransomware attack was simply to encrypt a user's data and hold it for ransom, ransomware attacks are now primarily the last phase of a multi-pronged cyberattack that is targeted at confidential data, and that has as its prime motivation the theft of confidential data

---

[8] *See* Department of Attorney General, *AG Nessel Issues Information, Warning Related to Morley Companies Data Breach*, https://www.michigan.gov/ag/0,4534,7-359-92297_47203-577296--,00.html (last visited Feb. 14, 2022).
[9] *Id.*

like the Personal Information stolen here. A recent analysis shows that data exfiltration occurs in 70% of all ransomware attacks.[10]

36.    Upon information and belief, the cyberattack was targeted at Defendant, due to its status as a business that collects, creates, and maintains PII.

37.    Because of this targeted cyberattack, data thieves were able to gain access to and obtain data from Morley that included the Private Information of Plaintiffs and Class Members.

38.    The files stolen from Morley contained at least the following information of Plaintiffs and Class Members: names, addresses, dates of birth, and insurance information that may have included medication, condition or provider.

39.    The Private Information contained in Morley's network was not encrypted.

40.    Plaintiffs' Private Information was accessed and stolen in the Data Breach. Plaintiffs believe their stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals.

---

[7] Jessica Davis, *70% Ransomware Attacks Cause Data Exfiltration; Phishing Top Entry Point*, HealthITSecurity (Feb. 3, 2021), https://healthitsecurity.com/news/70-ransomware-attacks-cause-data-exfiltration-phishing-top-entry-point (last visited Feb. 11, 2022).

41.    Morley admits in the Notice Letter that Plaintiffs' Private Information may have been "accessed" by cybercriminals in the Data Breach.[11]

42.    As a result of the Data Breach, Morley informed Plaintiffs and Class Members to take steps to "safeguard your information" and also encouraged Class Members to enroll in identity monitoring services.[12]

43.    That Morley is encouraging Plaintiffs and Class Members to enroll in credit monitoring and identity theft restoration services is an acknowledgment that the impacted individuals are subject to a substantial and imminent threat of fraud and identity theft.

44.    Morley had obligations created by contract, industry standards, and common law to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

45.    Morley could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing PII.  Morley also failed to give timely and accurate notice of the Data Breach. Morley admits that the breach was first discovered on August 21, 2021, and it did not send notice until February 1, 2022.

---

[11]    *See*    https://www.mass.gov/doc/assigned-data-beach-number-25888-morley-companies-inc-additional-information/download (last visited Feb. 11, 2022).
[12] *Id.*

***Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' PII.***

46.     Morley acquires, collects, and stores a massive amount of PII on its and its clients' employees, former employees and other personnel.

47.     As a condition of employment, or as a condition of receiving certain benefits, Morley requires that employees, former employees, other personnel and its clients entrust it with highly sensitive PII.

48.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

49.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

50.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***The Data Breach was a Foreseeable Risks of which Defendant was on Notice***

51.     It is well known that PII, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

52.     Individuals place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative

financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

53.    Individuals are particularly concerned with protecting the privacy of their Social Security numbers, which are the "secret sauce" that is "as good as your DNA to hackers." There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."

54.    In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[13]

55.    In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Morley knew or should have known that its electronic records would be targeted by cybercriminals.

---

[13] Bree Fowler, *Data breaches break record in 2021*, CNET (Jan. 24, 2022), https://www.cnet.com          /tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last visited Feb. 11, 2022).

56.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.

57.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Morley failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

### At All Relevant Times Morley Had a Duty to Plaintiffs and Class Members to Properly Secure their Private Information

58.     At all relevant times, Morley had a duty to Plaintiffs and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to promptly notify Plaintiffs and Class Members when Morley became aware that their PII may have been compromised.

59.     Morley had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Morley breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

60.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

a.  Maintaining a secure firewall configuration;

b.  Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.  Monitoring for suspicious or irregular traffic to servers;

d.  Monitoring for suspicious credentials used to access servers;

e.  Monitoring for suspicious or irregular activity by known users;

f.  Monitoring for suspicious or unknown users;

g.  Monitoring for suspicious or irregular server requests;

h.  Monitoring for server requests for PII;

i.  Monitoring for server requests from VPNs; and

j.  Monitoring for server requests from Tor exit nodes.

61.  The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or

---

[14] 17 C.F.R. § 248.201 (2013).

identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

62.    The ramifications of Morley's failure to keep its employees' and consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims may continue for years.

### *The Value of Personal Identifiable Information*

63.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[16]

64.    Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

65.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security

---

[15] *Id.*

[16] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 11, 2022).

[17] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Feb. 11, 2022).

Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

66.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

---

[18] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 11, 2022).

[19] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-

68.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[20]

69.    PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[21]

70.    Given the nature of the Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

---

by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Feb. 11, 2022.

[20] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, Computerworld (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 11, 2022).

[21] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.2, https://itlaw.fandom.com/wiki/OMB_Memorandum_M-07-16#cite_note-1 (last visited Feb. 11, 2022).

71.    The information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

72.    To date, Morley has offered its consumers only one year of identity monitoring service. The offered services are inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

73.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Morley's failure to implement or maintain adequate data security measures for its current and former customers.

### *Morley Failed to Comply with FTC Guidelines*

74.    Federal and State governments have likewise established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[22]

75.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental

---

[22] Federal Trade Commission, *Start With Security*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Feb. 14, 2022).

data security principles and practices for business.[23] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

76.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[24]

77.    The FTC recommends that businesses:

    a.  Identify all connections to the computers where you store sensitive information.

    b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

    c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

    d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not

---

[23] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited Feb. 14, 2022).
[24] FTC, *Start With Security*, *supra* note 20.

needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications— the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

78.    The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

79.    Because Class Members entrusted Morley with their PII, Morley had, and has, a duty to the Class Members to keep their PII secure.

80.    Plaintiffs and the other Class Members reasonably expected that when they provide PII to Morley, Morley would safeguard their PII.

81.    Morley was at all times fully aware of its obligation to protect the personal and financial data of employees and consumers, including that of Plaintiffs and Members of the Class. Morley was also aware of the significant repercussions if it failed to do so.

82.    Morley's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiffs' and Class Members' Social Security numbers, driver's license numbers, financial account information, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### Defendant Fails to Comply with Industry Standards

83.    Several best practices have been identified that at a minimum should be implemented by companies like Defendant Morley, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

84.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems;

setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

85.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***Plaintiffs and Class Members Have Suffered Concrete Injury As A Result Of Defendant's Inadequate Security And The Data Breach It Allowed.***

87.    Plaintiffs and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Plaintiffs and Class Members provided Defendant with sensitive personal information, including their Social Security numbers, health insurance information and driver's license numbers.

88.    Cybercriminals capture PII to exploit it; Plaintiffs and the Class Members are now, and for the rest of their lives will be, at a heightened and

substantial risk of identity theft. Plaintiffs have also incurred (and will continue to incur) damages in the form of, *inter alia*, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

89. The cybercriminals who obtained Plaintiffs' and the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

90. In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

91.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

92.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.[25]

93.    Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. Indeed, the level of risk is growing for anyone whose information is stolen in a data breach.[26] Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[27] Moreover, there is a high likelihood that significant identity fraud

---

[25] *Id.*

[26] Susan Ladika, *Study: Data Breaches Pose A Greater Risk*, CREDITCARDS.COM (July 23, 2014), https://www.susanladika.com/freelance_writer_susan_ladika_personal_finance_data_breaches_pose_a_greater_risk.html (last visited Feb. 24, 2022).

[27] THE CONSUMER DATA INSECURITY REPORT: EXAMINING THE DATA BREACH-IDENTITY FRAUD PARADIGM IN FOUR MAJOR METROPOLITAN AREAS, https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf (last visited Feb. 24, 2022).

and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

94.     As a result of the Data Breach, Plaintiffs and Class Members have already suffered damages.

95.     Defendant openly admits that the cybercriminals "accessed" Plaintiffs' and Class Members' data in the Breach.

**_Plaintiff Dianna Kometh's Experience_**

96.     Plaintiff Kometh was required to provide her PII to her health insurance company through approximately October 2021. Defendant possessed Plaintiff Kometh's PII on or before August 1, 2021.

97.     On or about February 1, 2022, Plaintiff Kometh received notice from Defendant that her PII had been improperly accessed by unauthorized third parties. This notice indicated that Plaintiff Kometh's PII, including name, health plan member ID, address, date of birth, and health insurance information (that may have included, among other things, medication, condition, or provider information), was compromised as a result of the Data Breach.

98.     Following the Data Breach, Plaintiff Kometh was notified by her bank on three separate occasions that unauthorized third person(s) were able to access her financial information and incur charges on her debit card.  (This is the same payment

card she used to pay for certain medical procedures).  This first occurred in September 2021, then again in November and December 2021.  Each time, Plaintiff Kometh was inconvenienced because she was not able to use her payment card while a new card was being issued to her by mail.  She spent considerable time changing her methods of payment for various bills and communicating with her bank regarding the fraud.

99.    Also following the Data Breach, Plaintiff Kometh has experienced a substantial uptick in the number and frequency of spam telephone, text and email contacts related to medical insurance and/or pharmaceutical products.

100.    Plaintiff Kometh made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant; contacting her bank on multiple occasions, and dealing with unwanted spam.  Plaintiff Kometh has spent approximately 10-15 hours dealing with the Data Breach, valuable time Plaintiff Kometh otherwise would have spent on other activities, including but not limited to work and/or recreation.

101.    As a result of the Data Breach, Plaintiff Kometh has suffered emotional distress due to the release of her PII, which she believed would be protected from

unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII for purposes of identity theft and fraud. Plaintiff Kometh is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

102.   Plaintiff Kometh suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from Plaintiff Kometh; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

103.   As a result of the Data Breach, Plaintiff Kometh anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Kometh is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Sally LaBree's Experience

104.   Plaintiff LaBree was required to provide her PII to her health insurance company before August 1, 2021.

105.   On or about February 1, 2022, Plaintiff LaBree received notice from Defendant that her PII had been improperly accessed by unauthorized third parties. This notice indicated that Plaintiff LaBree's PII, including name, health plan

member ID, address, date of birth, and health insurance information (that may have included, among other things, medication, condition, or provider information), was compromised as a result of the Data Breach.

106.   Following the Data Breach, Plaintiff LaBree has experienced a substantial uptick in the number and frequency of spam email contacts.

107.   Plaintiff LaBree made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant, and dealing with unwanted spam. Plaintiff LaBree has spent at least three hours dealing with the Data Breach, valuable time Plaintiff LaBree otherwise would have spent on other activities, including but not limited to work and/or recreation.

108.   As a result of the Data Breach, Plaintiff LaBree has suffered emotional distress due to the release of her PII, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII for purposes of identity theft and fraud. Plaintiff LaBree is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

109.  Plaintiff LaBree suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from Plaintiff LaBree; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

110.  As a result of the Data Breach, Plaintiff LaBree anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff LaBree is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Harry Peterson's Experience*

111.  Plaintiff Peterson was required to provide his PII to his health insurance company before August 1, 2021.

112.  On or about February 1, 2022, Plaintiff Peterson received notice from Defendant that his PII had been improperly accessed by unauthorized third parties. This notice indicated that Plaintiff Peterson's PII, including name, health plan member ID, address, date of birth, and health insurance information (that may have included, among other things, medication, condition, or provider information), was compromised as a result of the Data Breach.

113.   Following the Data Breach, Plaintiff Peterson has experienced a substantial uptick in the number and frequency of spam telephone contacts related to medical insurance and personal loans.

114.   Plaintiff Peterson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant, and dealing with unwanted spam. Plaintiff Peterson has spent at least four hours dealing with the Data Breach, valuable time Plaintiff Peterson otherwise would have spent on other activities, including but not limited to recreation.

115.   As a result of the Data Breach, Plaintiff Peterson has suffered emotional distress due to the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff Peterson is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

116. Plaintiff Peterson suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his PII, a form of property that Defendant obtained

from Plaintiff Peterson; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

117.   As a result of the Data Breach, Plaintiff Peterson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.  As a result of the Data Breach, Plaintiff Peterson is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### *Plaintiff Patrick Burnham's Experience*

118.   Plaintiff Burnham was required to provide his PII to his health insurance company before August 1, 2021.

119.   On or about February 1, 2022, Plaintiff Burnham received notice from Defendant that his PII had been improperly accessed by unauthorized third parties. This notice indicated that Plaintiff Burnham's PII, including name, health plan member ID, address, date of birth, and health insurance information (that may have included, among other things, medication, condition, or provider information), was compromised as a result of the Data Breach.

120.   Following the Data Breach, Plaintiff Burnham has experienced a substantial uptick in the number and frequency of spam telephone contacts on both his cellphone and home telephone lines related to medical insurance and products.

121.   Plaintiff Burnham made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to:  researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; researching and signing up for credit monitoring and identity theft protection services offered by Defendant, and dealing with unwanted spam. Plaintiff Burnham has spent at least 10 hours dealing with the Data Breach, valuable time Plaintiff Burnham otherwise would have spent on other activities, including but not limited to work and/or recreation.

122.   As a result of the Data Breach, Plaintiff Burnham has suffered emotional distress due to the release of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud.  Plaintiff Burnham is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

123.   Plaintiff Burnham suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of his PII, a form of property that Defendant obtained from Plaintiff Burnham; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

124.   As a result of the Data Breach, Plaintiff Burnham anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Burnham is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS ACTION ALLEGATIONS

125.   Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class").

126.   Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was maintained on Defendant Morley's computer systems that were compromised in the Data Breach, and who were sent Notice of the Data Breach.

127.   Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

128.   Plaintiffs hereby reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

129.   <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists at least 500,000 persons whose data was compromised in Data Breach.

130.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

    b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    d.   Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

    e.   Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k.  Whether Defendant breached implied contracts for adequate data security with Plaintiffs and Class Members;

l.  Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Plaintiffs and Class Members;

m.  Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

n.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

131.  Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

132.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

133.  <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

134.  <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action

presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

135.   Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

136.   Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

     a.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

     b.  Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

     c.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

     d.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

137. Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On behalf of Plaintiffs and All Class Members)**

138. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 137 above as if fully set forth herein.

139. Defendant directly or indirectly through its clients required Plaintiffs and Class Members to submit non-public PII as a condition of receiving benefits.

140. Plaintiffs and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information.

141. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

142.   By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

143.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

144.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

145.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' PII; and

e. Failing to detect in a timely manner that Class Members' PII had been compromised.

146. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

147. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

148. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

149. As a result of Defendant's negligence, Plaintiffs and the Class Members have suffered and will continue to suffer damages and injury including, but not

limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

150. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

151. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>SECOND COUNT</u>**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and All Class Members)**

152. Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 137 above as if fully set forth herein.

153. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

154.   On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

155.   Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

156.   Defendant required Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

157.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

158.   Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiffs and Class Members would not

have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

159.   Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

160.   Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

161.   As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

162.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

163.   Plaintiffs and Class Members are also entitled to nominal damages for the breach of implied contract.

164.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD COUNT
**Unjust Enrichment**
**(On Behalf of Plaintiffs and All Class Members)**

165.   Plaintiffs restate and reallege paragraphs 1 through 137 above as if fully set forth herein.

166.   Plaintiffs allege Count III (unjust enrichment) solely in the alternative to Count II (breach of implied contract).

167.   Plaintiffs and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable PII.

168.   Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiffs and Class Members and accepted that monetary benefit.

169.   However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

170.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class

Members, because Defendant failed to implement appropriate data management and security measures.

171.   Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

172.   If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

173.   Plaintiffs and Class Members have no adequate remedy at law. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect,

contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

174.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

175.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a. For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection,

storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e.   Ordering Defendant to pay for lifetime credit monitoring services for Plaintiffs and the Class;

f.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

g.   For an award of punitive damages, as allowable by law;

h.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.   Pre- and post-judgment interest on any amounts awarded; and

j.   Such other and further relief as this court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

DATED: February 15, 2022                    Respectfully submitted,

                                            /s/ *Sharon S. Almonrode*
                                            E. Powell Miller (P39487)
                                            Sharon S. Almonrode (P33938)
                                            **THE MILLER LAW FIRM, P.C.**
                                            950 West University Drive
                                            Rochester, MI 48307
                                            Telephone: (248) 841-2200
                                            ssa@millerlawpc.com
                                            epm@millerlawpc.com

                                            WOLF HALDENSTEIN ADLER
                                              FREEMAN & HERZ LLP
                                            RACHELE R. BYRD*
                                            OANA CONSTANTIN*
                                            750 B Street, Suite 1820
                                            San Diego, CA 92101
                                            Telephone: (619) 239-4599
                                            Facsimile: (619) 234-4599
                                            byrd@whafh.com
                                            constantin@whafh.com
                                            *pro hac vi*ce forthcoming

                                            M. ANDERSON BERRY
                                            GREGORY HAROUTUNIAN
                                            (*pro hac vice* forthcoming)
                                            CLAYEO C. ARNOLD,
                                            A PROFESSIONAL LAW CORP.
                                            865 Howe Avenue
                                            Sacramento, CA 95825
                                            Telephone:  (916) 239-4778
                                            Facsimile:   (916) 924-1829
                                            aberry@justice4you.com
                                            gharoutunian@justice4you.com

                                            *Attorneys for Plaintiffs and
                                            the Proposed Class*